# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

|  |  |  |
|---|---|---|
| BOURBON COMMUNITY HOSPITAL, LLC d/b/a BOURBON COMMUNITY HOSPITAL; | ) ) ) ) | |
| CASEY COUNTY HOSPITAL, INC.; | ) ) | |
| COMMUNITY UNITED METHODIST HOSPITAL, INC. d/b/a METHODIST HOSPITAL and METHODIST HOSPITAL UNION COUNTY; | ) ) ) ) ) | CIVIL ACTION NO. 3:15-CV-455-JHM |
| CUMBERLAND COUNTY HOSPITAL ASSOCIATION, INC. d/b/a CUMBERLAND COUNTY HOSPITAL; | ) ) ) ) | |
| GEORGETOWN COMMUNITY HOSPITAL, LLC d/b/a GEORGETOWN COMMUNITY HOSPITAL; | ) ) ) ) | |
| GRAYSON COUNTY HOSPITAL FOUNDATION, INC. d/b/a TWIN LAKES REGIONAL MEDICAL CENTER; | ) ) ) ) | |
| HARRISON MEMORIAL HOSPITAL, INC. d/b/a HARRISON MEMORIAL HOSPITAL; | ) ) ) ) | |
| JANE TODD CRAWFORD MEMORIAL HOSPITAL, INC. d/b/a JANE TODD CRAWFORD HOSPITAL; | ) ) ) ) | |
| KENTUCKY HOSPITAL, LLC d/b/a CLARK REGIONAL MEDICAL CENTER; | ) ) ) | |
| LAKE CUMBERLAND REGIONAL HOSPITAL, LLC d/b/a LAKE CUMBERLAND REGIONAL HOSPITAL; | ) ) ) ) | |
| LOGAN MEMORIAL HOSPITAL, LLC d/b/a LOGAN MEMORIAL HOSPITAL; | ) ) | |

MARCUM & WALLACE MEMORIAL     )
HOSPITAL, INC. d/b/a MARCUM &     )
WALLACE MEMORIAL HOSPITAL;     )
                                )
MEADOWVIEW REGIONAL MEDICAL     )
CENTER, LLC d/b/a MEADOWVIEW     )
REGIONAL MEDICAL CENTER;     )
                                )
MERCY HEALTH PARTNERS –     )
LOURDES INC. d/b/a LOURDES     )
HOSPITAL;     )
                                )
NEW HORIZONS HEALTH SYSTEMS,     )
INC. d/b/a NEW HORIZONS MEDICAL     )
CENTER;     )
                                )
PINELAKE REGIONAL HOSPITAL, LLC     )
d/b/a JACKSON PURCHASE MEDICAL     )
CENTER;     )
                                )
RUSSELL COUNTY, KENTUCKY     )
HOSPITAL DISTRICT HEALTH     )
FACILITIES CORPORATION d/b/a     )
RUSSELL COUNTY HOSPITAL     )
                                )
SPRING VIEW HOSPITAL, LLC d/b/a     )
SPRING VIEW HOSPITAL;     )
                                )
TRIGG COUNTY HOSPITAL, INC. d/b/a     )
TRIGG COUNTY HOSPITAL;     )
                                )
WAYNE COUNTY HOSPITAL, INC. d/b/a     )
WAYNE COUNTY HOSPITAL;     )
                                )
WOODFORD HOSPITAL, LLC d/b/a     )
BLUEGRASS COMMUNITY HOSPITAL;     )
                                )
                                )
            PLAINTIFFS,     )
v.                              )
                                )
COVENTRY HEALTH AND LIFE     )
INSURANCE COMPANY     )
                                )
                                )

Serve:   CT Corporation

306 W. Main Street                               )
Suite 512                                        )
Frankfort, KY 40601                              )
                                                 )
WELLCARE    HEALTH    INSURANCE                   )
COMPANY  OF  KENTUCKY,  INC.  d/b/a               )
WELLCARE OF KENTUCKY, INC.                        )
                                                 )
Serve:  CT Corporation                           )
        306 W. Main Street                        )
        Suite 512                                 )
        Frankfort, KY 40601                       )
                                                 )
            DEFENDANTS.                           )
                                                 )

### COMPLAINT FOR DECLARATORY, INJUNCTIVE AND COMPENSATORY RELIEF

Plaintiffs, Bourbon Community Hospital, LLC d/b/a Bourbon Community Hospital; Casey County Hospital, Inc.; Community United Methodist Hospital, Inc. d/b/a Methodist Hospital and Methodist Hospital Inc.; Cumberland County Hospital Association, Inc. d/b/a Cumberland County Hospital; Georgetown Community Hospital, LLC d/b/a Georgetown Community Hospital; Grayson County Hospital Foundation, Inc. d/b/a Twin Lakes Regional Medical Center; Harrison Memorial Hospital, Inc. d/b/a Harrison Memorial Hospital; Jane Todd Crawford Memorial Hospital, Inc. d/b/a Jane Todd Crawford Hospital; Kentucky Hospital, LLC d/b/a Clark Regional Medical Center; Lake Cumberland Regional Hospital, LLC d/b/a Lake Cumberland Regional Hospital; Logan Memorial Hospital, LLC d/b/a Logan Memorial Hospital; Marcum & Wallace Memorial Hospital, Inc. d/b/a Marcum & Wallace Memorial Hospital; Meadowview Regional Medical Center, LLC d/b/a Meadowview Regional Medical Center; Mercy Health Partners – Lourdes Inc. d/b/a Lourdes Hospital; New Horizons Health Systems, Inc. d/b/a New Horizons Medical Center; PineLake Regional Hospital, LLC d/b/a Jackson

Purchase Medical Center; Russell County, Kentucky Hospital District Health Foundation Corporation d/b/a Russell County Hospital; Spring View Hospital, LLC d/b/a Spring View Hospital; Trigg County Hospital, Inc. d/b/a Trigg County Hospital; Wayne County Hospital, Inc. d/b/a Wayne County Hospital; and Woodford Hospital, LLC d/b/a Bluegrass Community Hospital, for their Complaint, state as follows:

## INTRODUCTION

Plaintiffs have contracted with Defendants to provide health care services to Members of Defendants' Medicaid managed care plans in Kentucky.  Defendants have refused to fully pay Plaintiffs for certain outpatient services, however, in violation of their contracts with the Plaintiffs, the Defendants' contracts with the State of Kentucky, and applicable state and federal laws.  Plaintiffs bring this Complaint against the Defendants seeking declaratory, injunctive and compensatory relief from Defendants' continuing breaches of contract and violations of federal and state laws.

## THE PARTIES

### a.  Plaintiffs

1.      Plaintiff, Bourbon Community Hospital, LLC d/b/a Bourbon Community Hospital, owns and operates a hospital in Bourbon County, Kentucky participating in the Kentucky Medicaid Program.

2.      Plaintiff, Casey County Hospital, Inc. d/b/a Casey County Hospital, owns and operates a hospital in Casey County, Kentucky participating in the Kentucky Medicaid Program.

3.      Plaintiff, Community United Methodist Hospital, Inc. d/b/a Methodist Hospital and Methodist Hospital Union County, owns and operates hospitals in Henderson and Union County, Kentucky participating in the Kentucky Medicaid Program.

4.     Plaintiff, Cumberland County Hospital Association, Inc. d/b/a Cumberland County Hospital, owns and operates a hospital in Cumberland County, Kentucky participating in the Kentucky Medicaid Program.

5.     Plaintiff, Georgetown Community Hospital, LLC d/b/a Georgetown Community Hospital, owns and operates a hospital in Scott County, Kentucky participating in the Kentucky Medicaid Program.

6.     Plaintiff, Grayson County Hospital Foundation, Inc. d/b/a Twin Lakes Regional Medical Center, owns and operates a hospital in Grayson County, Kentucky participating in the Kentucky Medicaid Program.

7.     Plaintiff, Harrison Memorial Hospital, Inc. d/b/a Harrison Memorial Hospital, owns and operates a hospital in Harrison County, Kentucky participating in the Kentucky Medicaid Program.

8.     Plaintiff, Jane Todd Crawford Memorial Hospital, Inc. d/b/a Jane Todd Crawford Hospital, owns and operates a hospital in Green County, Kentucky participating in the Kentucky Medicaid Program.

9.     Plaintiff, Kentucky Hospital, LLC d/b/a Clark Regional Medical Center, owns and operates a hospital in Clark County, Kentucky participating in the Kentucky Medicaid Program.

10.    Plaintiff, Lake Cumberland Regional Hospital, LLC d/b/a Lake Cumberland Regional Hospital, owns and operates a hospital in Pulaski County, Kentucky participating in the Kentucky Medicaid Program.

11.     Plaintiff, Logan Memorial Hospital, LLC d/b/a Logan Memorial Hospital, owns and operates a hospital in Logan County, Kentucky participating in the Kentucky Medicaid Program.

12.     Plaintiff, Marcum & Wallace Memorial Hospital, Inc. d/b/a Marcum & Wallace Memorial Hospital, owns and operates a hospital in Estill County, Kentucky participating in the Kentucky Medicaid Program.  Marcum & Wallace Memorial Hospital, Inc. asserts claims herein only against WellCare Health Insurance Company of Kentucky, Inc.

13.      Plaintiff, Meadowview Regional Medical Center, LLC d/b/a Meadowview Regional Medical Center, owns and operates a hospital in Mason County, Kentucky participating in the Kentucky Medicaid Program.

14.     Plaintiff, Mercy Health Partners – Lourdes, Inc. d/b/a Lourdes Hospital, owns and operates a hospital in McCracken County, Kentucky participating in the Kentucky Medicaid Program.  Mercy Health Partners – Lourdes, Inc. asserts claims herein only against WellCare Health Insurance Company of Kentucky, Inc.

15.      Plaintiff, New Horizons Health Systems, Inc. d/b/a New Horizons Medical Center, owns and operates a hospital in Owen County, Kentucky participating in the Kentucky Medicaid Program.

16.     Plaintiff, PineLake Regional Hospital, LLC d/b/a Jackson Purchase Medical Center, owns and operates a hospital in Graves County, Kentucky participating in the Kentucky Medicaid Program.

17.     Russell County Kentucky Hospital District Health Foundation Corporation d/b/a Russell County Hospital owns and operates a hospital in Russell County, Kentucky participating in the Kentucky Medicaid Program.

18.     Plaintiff, Spring View Hospital, LLC d/b/a Spring View Hospital, owns and operates a hospital in Marion County, Kentucky participating in the Kentucky Medicaid Program.

19.     Plaintiff, Trigg County Hospital, Inc. d/b/a Trigg County Hospital, owns and operates a hospital in Trigg County, Kentucky participating in the Kentucky Medicaid Program.

20.     Plaintiff, Wayne County Hospital, Inc. d/b/a Wayne County Hospital, owns and operates a hospital in Wayne County, Kentucky participating in the Kentucky Medicaid Program.

21.     Plaintiff, Woodford Hospital, LLC d/b/a Bluegrass Community Hospital, owns and operates a hospital in Woodford County, Kentucky participating in the Kentucky Medicaid Program.

### b. <u>Defendants</u>

22.     Defendant, Coventry Health and Life Insurance Company ("**Coventry**"), is a for-profit, Delaware corporation authorized to do business in the Commonwealth of Kentucky.  Its main office in Kentucky is at 9900 Corporate Campus Drive, Suite 1000, Louisville, Kentucky 40223.

23.     Defendant, WellCare Health Insurance of Kentucky, Inc. d/b/a WellCare of Kentucky, Inc. ("**WellCare**"), is a for-profit, Kentucky corporation authorized to do business in the Commonwealth of Kentucky.  Its principal office in the Commonwealth of Kentucky is 13551 Triton Park Boulevard, Suite 1800, Louisville, Kentucky 40223.

## JURISDICTION AND VENUE

24.     This action is brought pursuant to 28 U.S.C. §§ 1331; 1343(a)(3) and 2201.  The Court also has supplemental jurisdiction over the state claims herein pursuant to 28 U.S.C. § 1367.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(c).

## BACKGROUND AND FACTS

### The Federal Medicaid Scheme

25.     Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v ("**Medicaid Act**"), provides for the establishment of the Medicaid program.  The Medicaid program is a cooperative federal-state program whereby the federal government provides financial assistance to the states so they may furnish medical care to low-income individuals and families in designated eligibility groups.

26.     The Cabinet for Health and Family Services (the "**Cabinet**"), is the administrative agency of the Commonwealth of Kentucky assigned responsibility for administering the Kentucky Medical Assistance Program ("**KMAP**") pursuant to KRS 205.510 to 205.630.  These statutes provide for the implementation of the federal Medicaid program in Kentucky in accordance with the provisions of Title XIX of the Social Security Act and applicable federal regulations.  The Cabinet administers KMAP through its Department for Medicaid Services ("**DMS**") as provided in KRS 194A.030(2).

27.     To qualify for federal financial participation, a state must submit a plan for medical assistance to the federal Centers for Medicare and Medicaid Services ("**CMS**") and secure its approval of the plan.  *See* 42 U.S.C. § 1396a (a) and (b); 42 C.F.R. Pt. 430, sub pt. B.  KMAP has been established according to such a plan that the Cabinet filed with CMS and that it updates or modifies periodically (the "**State Plan**").

28.     The State Plan submitted by the Cabinet must "provide such safeguards as may be necessary to assure that … care and services will be provided [  ] in a manner consistent with … the best interests of the recipients."  42 U.S.C. § 1396a(a)(19).

29.     The Medicaid Act requires that beneficiaries be permitted to receive healthcare services from participating providers of their choice, 42 U.S.C. §1396a(a)(23) (the "**freedom of choice**" provision), and that the state pay those providers directly on a fee-for-service basis according to state-established fee schedules.  42 U.S.C. §1396a(a)(30)(A).

## The Waiver

30.     Alternatively, States may seek waivers from the requirements of the traditional fee-for-service program and the freedom of choice provision, and obtain permission to provide healthcare services through managed care systems.  In such systems Medicaid managed care organizations, such as WellCare and Coventry, sign contracts with the state to provide healthcare services to Medicaid beneficiaries in return for capitation payments from the state.  The managed care organizations then enroll Medicaid beneficiaries as "**Members**" in their respective health plans, contract with providers to provide care to their Members, and pay those providers for their services.

31.     Both the waiver and the contracts between the managed care companies and the state must be approved by CMS and comply with certain statutory and regulatory requirements. 42 U.S.C. §1396b(m)(2)(A)(iii); 42 C.F.R. §§438.86(b) & 438.6.

32.     The Cabinet submitted a request to CMS for a waiver under Section 1915(b) of the Act (the "**Waiver**") that was approved by CMS and became effective November 1, 2011, for most of the state.  CMS subsequently gave approval to amend or expand that Waiver effective

January 1, 2013, so that now it covers the entire state.  CMS is in the process of approving further extensions of the Waiver for state fiscal years ("**SFY**") 2015 and 2016.

33.   To gain CMS approval of the Waiver and to fulfill statutory and regulatory requirements, Coventry and WellCare entered into contracts with the Commonwealth of Kentucky to act as managed care organizations and provide healthcare services to Kentucky Medicaid beneficiaries that enrolled in each of their health plans.  These organizations are sometimes referred to generically as "Managed Care Organizations", or "**MCOs**".

**The MCO's Are Required to Provide Emergency Services**

34.   As already noted both Coventry and WellCare have entered into contracts ("**MCO Contracts**") with the Commonwealth of Kentucky through its Finance and Administration Cabinet for DMS and the Cabinet.

35.   The MCO Contracts have been approved by CMS.

36.   In their MCO contracts and as a condition to receiving payments that include federal monies, Coventry and WellCare agreed, among other things, as follows:

> At all times during the term of this Contract and in the performance of every aspect of this Contract, the Contractor shall strictly adhere to all applicable federal and Commonwealth law (statutory and case law), regulations and standards, in effect when this Contract is signed or which may come into effect during the term of this Contract, except where waivers of said laws, regulations or standards are granted by applicable federal or Commonwealth authority.

37.   Under federal law each MCO contract must provide coverage for emergency services without regard to prior authorization or the emergency care provider's contractual relationship with the MCO.  42 U.S.C. § 1396u-2(b)(2)(A)(i).

38.   The federal statute continues to define "Emergency services" as follows:

10 of 29

In subparagraph (A)(i) the term "emergency services" means, with respect to an individual enrolled with an organization, covered inpatient and outpatient services that –

(i) are furnished by a provider that is qualified to furnish such services under this subchapter, and

(ii) are needed to evaluate or stabilize an emergency medical condition (as defined in subparagraph (C)).

(C) "Emergency medical condition" defined

In subparagraph (B)(ii) the term "emergency medical condition" means a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in –

(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy;

(ii) serious impairment to bodily functions, or

(iii) serious dysfunction to any bodily organ or part.

42 U.S.C. § 1396u-2(b)(2)(B) and (C).

39.    The MCO contracts also require that "Emergency Medical Services shall be made available to Members twenty-four (24) hours a day, seven (7) days a week."

**Federally Mandated Emergency Services**

40.    Plaintiffs are required to comply with the Emergency Medical Treatment and Active Labor Act ("**EMTALA**"), 42 U.S.C. § 1395dd.  Under EMTALA, hospitals providing emergency room services must evaluate and stabilize all persons who present themselves needing emergency services regardless of their ability to pay or whether they have health insurance.

41.     If an individual comes to the emergency department ("**ED**") of a hospital and a request is made on the individual's behalf for examination or treatment, the hospital must provide for an appropriate medical screening in its ED, including any ancillary services routinely available, to determine whether an emergency medical condition exists.  42 U.S.C. § 1395dd(a).

42.     What constitutes an emergency medical condition may not be determined on the basis of lists of diagnoses or symptoms.  *See* 42 C.F.R. § 438.114 (d)(1)(i).

43.     42 CFR § 438.114 (a) requires the use of the "prudent layperson" standard in determining whether a medical emergency exists:

> Emergency medical condition means a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) that *a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical condition to result in* the following:
>
> (1) Placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy.
>
> (2) Serious impairment to bodily functions.
>
> (3) Serious dysfunction of any bodily organ or part.

44.     The regulation defines "Emergency services" to mean "covered inpatient and outpatient services" that are as follows:

> (1) Furnished by a provider that is qualified to furnish those services under this title.
>
> (2) Needed to evaluate or stabilize an emergency medical condition.

42 C.F.R. § 438.114(a).

45.     If, upon evaluation, an emergency medical condition is found to exist, a hospital must provide stabilizing treatment or appropriate transfer for the individual:

> If any individual … comes to a hospital and the hospital
> determines that the individual has an emergency medical
> condition, the hospital must provide either (A) within the staff and
> facilities available at the hospital, for such further medical
> examination and such treatment as may be required to stabilize the
> medical condition, or (B) for transfer of the individual to another
> medical facility.

42 U.S.C. § 1395 dd(b)(1)

46.     The required screening and examination that hospitals are required by EMTALA

to provide are more extensive than mere "triage."  A hospital that relies on triage practices to

satisfy its duty to evaluate patients presenting themselves in the hospital's ED risks potential loss

of its Medicaid certification as well as fines and penalties.

47.     Because Medicaid–participating hospitals such as the Plaintiffs here have no

choice but to provide a full medical screening and examination for patients who come to their

emergency rooms, the regulation further provides that MCOs such as Defendants here are

responsible for coverage and payment of emergency services and post stabilization care services.

42 U.S.C. § 438.114(b).

48.     Furthermore, the federal regulation provides that an MCO may not deny payment

for treatment obtained when an "enrollee had an emergency medical condition, including cases

in which the absence of immediate medical attention would not have had the outcomes specified

in paragraphs (1), (2), and (3) of the definition of emergency medical condition in paragraph (a)

of this section."  42 C.F.R. § 438.114(c)(1)(ii)(A).  In other words, the MCOs cannot deny

payment for tests and procedures necessary to evaluate the patient's condition even though, in

retrospect, after necessary tests were performed to allow the patient to be properly diagnosed, it

may appear that serious harm would not have resulted.

**State Regulations Mirror Federal Definition of Emergency Condition**

49.     Consistent with federal law, state law provides that an MCO is required to "[c]over an emergency service … in accordance with 42 U.S.C. § 1396u-2(b)(2)(A)(i)," regardless of where the emergency service is provided and comply with 42 U.S.C. § 1396u-2(b)(2)(A)(ii).  907 KAR 17:020, Section 2(5)(c).

50.     The Cabinet in its regulations applicable to the MCOs defines "Emergency service" to have the same meaning as provided for that term in 42 U.S.C. § 1396u-2(b)(2)(B).  907 KAR 17:005 § 1(28).

51.     An MCO is required to make emergency services accessible to its enrollees without a referral from the enrollee's primary care provider.  907 KAR 17:020, Section 2(4)(f).

**The State Plan Amendment**

52.     Under federal law, a state, at its option and through a State Plan Amendment ("**SPA**") approved by CMS, may impose cost sharing on some groups of individuals covered by the State Plan for non-emergency services furnished in a hospital emergency department.  42 U.S.C. § 1396o-1(e).

53.     Under this law, an individual Medicaid beneficiary may be required to "cost-share", i.e., contribute to the cost of an emergency visit; only if he or she has "actually available and accessible … an alternate non-emergency services provider with respect to such services." *Id.*  Subsection (e)(A).

54.     In addition, after the hospital has given the individual an appropriate medical screening examination in the ED and determined that the individual does not have an emergency medical condition, the hospital must inform the individual of the following:  (1) that the hospital may require the payment of the State-specified co-pay before the services are provided in the

ED; (2) the name and location of an alternate non-emergency services provider that is actually available and accessible; (3) the fact that such alternate provider can provide the services without the imposition of a co-pay; and (4) the hospital provides a referral to coordinate scheduling of this treatment. *Id.*

55.    The Cabinet has submitted and CMS has approved such a cost sharing plan in State Plan Amendment - (SPA) 13-023.  Accordingly, the Cabinet and CMS contemplate full payment for hospital services in an emergency room even after it has been determined that no medical emergency exists under the above conditions.

56.    Consistent with federal law, SPA 13-023 recognizes that the medical professionals at the hospital make the determination of whether an emergent condition exists before advising members of co-pay obligations of non-emergent care:

> Hospitals will operationalize this process by performing the required EMTALA screening on the patient and if they determine the condition non-emergent (determined by a medical professional at the hospital), the ER staff (either a nurse, doctor or intake staff) will advise the recipient that it is not a condition that requires emergency treatment, and that they (the hospital) will assist them in locating another facility (late night clinic, etc.), call their primary care physician when they are open, or go to urgent care clinic that may be available.  If the individual still opts to be treated at the ER, they will be required to pay a $8.00 co pay.

SPA 13-023E., Attachment 4.18-A, Page 1(b).

57.    Thus, the Cabinet with CMS approval has again made it clear that the medical professional at the hospital who performs the EMTALA screening determines whether an emergency condition exists and what tests are necessary to make this determination.

58.    Furthermore, if the medical professional performing the screening determines an emergency condition does not exist, the Medicaid beneficiary, in his or her discretion, has the option to continue treatment in the ED for the non-emergent condition with the understanding

that an $8 co-pay is owed.  Accordingly, Coventry and WellCare must pay for and hold its Members harmless from the costs of any diagnostic tests necessary in the medical professional's judgment to adequately screen the Member as well as any non-emergent services their Members opt to receive with their promise to make a co-payment as they are entitled to do under SPA 13-023E.

### Traditional Medicaid Fee For Service Reimbursement Rates

59.     The Medicaid rates for emergency room services under the Cabinet's traditional fee-for-services methodology for general, acute care hospitals are set in accordance with 907 KAR 10:015.

60.     The Cabinet under its traditional fee-for-service reimbursement methodology does not pay hospitals a limited $50 "triage fee" for evaluating Medicaid beneficiaries who present themselves for treatment at hospital emergency departments.

61.     Outpatient laboratory services are generally reimbursed either at the Medicare-established technical component rate for the service in accordance with 907 KAR 1:029 or, if no Medicare rate exists for the particular laboratory service, the rate is determined by multiplying the hospital's current outpatient cost-to-charge ratio by its billed laboratory charges.  *Id.* Section 5.

62.     The Medicaid rates for all other outpatient services, including emergency services, are reimbursed at ninety-five percent of the hospital's costs with the exception of some limitations on payment for "lock in" patients who do not require emergency services.  907 KAR 10:015, Section 2.

63.     In addition, by state statute, both fee-for-service Medicaid and the MCOs are required to pay critical access hospitals ("**CAHs**") rates at least equal to those established by

CMS for Medicare patients. KRS 216.380(13). CMS has established rates paying CAHs 101 percent of their costs for ED services. 42 C.F.R. § 413.70(b)-(d).

### Coventry Provider Agreements

64.     Plaintiffs have entered into provider agreements with Coventry.

65.     Coventry requires in its provider agreements with Plaintiffs that they will comply with all applicable requirements, laws, rules and regulations of CMS, any other federal agencies and any agency of the State, including without limitation, requirements that shall cause or require Coventry to amend the terms and conditions of the provider agreement.

66.     Under the terms of the provider agreements, Plaintiffs agreed to provide Covered Services to individuals enrolled as "**Members**" in a benefit plan issued by Coventry pursuant to its MCO Contract with the Cabinet.

67.     In return for Plaintiffs providing services to these Members, Coventry agreed to pay for hospital services at rates agreed to in each Coventry provider agreement. Plaintiffs' agreements with Coventry do not authorize Coventry to pay "triage fees" in lieu of the contracted rates for emergency room services.

68.     Coventry agreed to reimburse Plaintiffs for outpatient services in accordance with Kentucky's outpatient Medicaid rates and methodologies.

69.     In agreeing to provide hospital services to Coventry's members, Plaintiffs reasonably relied upon Coventry's representations that it would abide by all applicable laws and regulations including all prompt pay laws and all requirements for the provision of, and reimbursements for, emergency and outpatient services.

## WellCare Provider Agreements

70.     Plaintiffs entered into provider agreements with WellCare either directly or through a "WellCare Participation Agreement" with WellCare's agent, Commonwealth Health Corporation d/b/a CenterCare, making the Plaintiffs part of a network in which WellCare is the obligated payor.

71.     Under the terms of the WellCare provider agreements, Plaintiffs agreed to provide Covered Services to individuals who are enrolled as "Members" in a benefit plan issued by WellCare pursuant to its MCO Contract with the Cabinet.

72.     In return for Plaintiffs providing services to these Members, WellCare agreed to pay Plaintiffs for their services at rates described in the WellCare provider agreement.  None of Plaintiffs' agreements with WellCare authorize WellCare to pay "triage fees" in lieu of the contracted rates for emergency room services.  Coventry agreed to pay Plaintiffs for outpatient services based on the Kentucky Medicaid payment system and methodologies.

73.     Included in these provider agreements is also the following or a similar provision:

> Compliance: In performing this Agreement, Providers and the Health Plan (WellCare) shall both comply with all applicable Laws and regulations and Program Requirements.

74.     Laws are defined as:

> Any and all applicable laws, regulations, rules, orders, standards, guidance, and instructions of any Governmental Authority, as adopted, amended or issued from time to time, including … (a) the Social Security Act . . . Title XIX ("Medicaid") . . . (f) state laws and regulations governing third party administrators or utilization review agents, (g) state laws and regulations governing prompt payment of claims, and (h) state laws and regulations governing the provisions of health care services.

75.     WellCare included such provisions in its provider agreements expressly incorporating all provisions of its MCO Contract "to the fullest extent applicable to the services

or activity to be performed under [the MCO Contract], including the obligation to comply with all applicable federal and Commonwealth laws and regulations .... "

76.     In agreeing to provide hospital services to WellCare's members, Plaintiffs reasonably relied upon WellCare's representations that it would abide by all applicable laws and regulations including all prompt pay laws and all requirements for the provisions of, and reimbursements for, emergency and outpatient services.

### The $50 Triage Rate Scheme

77.     Kentucky Spirit Health Plan, Inc. was a third MCO which contracted with the Commonwealth to provide Medicaid managed care services to Kentucky Medicaid beneficiaries beginning November 1, 2011.

78.     Kentucky Spirit was the lowest bidder awarded an MCO contract by the Cabinet in 2011.  The capitated rates it bid were not actuarially sound as required by federal law. Kentucky Spirit soon discovered substantial problems with the Cabinet's data included in its Data Book used in the Commonwealth's Request for Proposal ("**RFP**").[1]  Kentucky Spirit failed to sign provider agreements with all the hospitals needed to develop an adequate provider network and it quickly began to incur substantial losses on its Kentucky operations.

79.     In an effort to curb its losses, Kentucky Spirit sent a letter to Kentucky hospitals in early June, 2012, stating that beginning July 1, 2012, it would start making only a $50 "triage" payment for certain ED services.  Kentucky Spirit's letter stated, in part, as follows:

> Emergency Department (ED) claims coded with a diagnosis that represents a disease or condition that is recognized as an emergency will result in the claim being treated and reimbursed as

---

[1] *See, generally,* Complaint Filed in *Kentucky Spirit Health Plan Inc. v. Commonwealth of Kentucky*, Franklin Circuit Court, Civil Action No. 12-CI-1373.

an emergency service based on the rate negotiated with the hospital. Claims for emergency services submitted with a diagnosis that represents a disease or condition that is not recognized as an emergency situation will be paid at an ED triage rate of $50.00.

80.     The Kentucky Spirit letter stating that it would base its determination of whether the prudent layperson standard had been met based on the final diagnosis was a clear violation of federal law.

81.     WellCare soon copied Kentucky Spirit, sending a letter to Kentucky hospitals on or about July 31, 2012.  While WellCare stated it would adjudicate claims submitted from Emergency Departments according to the prudent layperson standard outlined in 907 KAR 3:130, it continued, however, to state in a contradictory manner that "the determination of a claim representing an emergency versus a non-emergent condition will be based on the diagnosis present on the claim" and "non-emergent care will be reimbursed at a triage rate of $50.00."  A true and correct copy of the WellCare Letter is attached here as **Exhibit A**.

82.     Coventry soon followed suit and issued a letter on December 31, 2012, to Kentucky hospitals stating that effective April 1, 2013, it would review "emergency department claims to ensure that claims for emergency medical conditions meet the prudent layperson standard, as defined by 907 KAR 3:130, Section 1(4)."  A true and correct copy of the Coventry Letter is attached hereto as **Exhibit B.**

83.     Coventry's letter also provided, however, that if it determined that the prudent layperson standard was not satisfied, the payment to the hospital would be a rate of $50. However, in reality Coventry has paid the $50 rate for claims that do in fact meet the prudent layperson standard

84.     Regardless of whether the claims are for emergent conditions, Coventry and WellCare have agreed to pay for all outpatient services using Kentucky Medicaid methodologies based on a percentage of costs.

## COUNT I
### (Declaratory Judgment)

85.     Plaintiffs reallege and incorporate fully by reference all preceding Paragraphs as if fully set forth herein.

86.     Medical personnel in Plaintiffs' emergency departments are responsible under federal law and state law for evaluating and treating Coventry and WellCare Members who present themselves for care in Plaintiffs' emergency departments.

87.     Coventry and WellCare are refusing or failing to fully pay Plaintiffs for the evaluations and treatments Plaintiffs, by law, are required to provide Medicaid patients.

88.     Plaintiffs desire a judicial determination of the parties' respective rights and obligations in connection with the applicable federal and state statutes, regulations and contractual provisions regarding the provision of and payment for emergency room services.

89.     Plaintiffs ask this Court to declare whether the criteria used by WellCare and Coventry, insofar as WellCare and Coventry use such criteria to deny or decrease reimbursement for emergency room services provided by Hospitals to their respective Members, illegally conflicts with the Plaintiffs' EMTALA obligations.

90.     Pursuant to SPA 13-023, medical personnel in Plaintiffs' emergency departments are responsible for evaluating Coventry and WellCare Members who present themselves for treatment in Plaintiffs' emergency departments.  If those medical personnel determine the Member does not have an emergent condition, Plaintiffs still must provide the Member with any

needed medical services in the ED if the Member so requests and promises to make an $8 co-pay.

91.     In agreeing to reimburse Plaintiffs following Kentucky Medicaid's methodologies for outpatient services, Coventry and WellCare are obligated to pay the agreed upon percentage of costs for all outpatient services (with the exception for "lock in" patients) regardless of whether the condition was emergent or not.  Plaintiffs desire a judicial determination that WellCare and Coventry must still pay their contracted rates for evaluative services and treatment for non-emergent services provided their Members upon the Member's request as provided in SPA 13-023 and in their provider agreements, and not the $50 "triage" fees Coventry and WellCare have unilaterally sought to impose on the Plaintiffs.

92.     An actionable and justiciable controversy and dispute now exists between Plaintiffs and Defendants and a declaratory judgment is needed declaring the rights of the parties and Defendants' obligation to pay for services provided to their Kentucky Medicaid members by Plaintiffs.

**<u>COUNT II</u>**
**(Breach of Contract)**
*Defendant Coventry*

93.     Plaintiffs reallege and incorporate fully by reference all proceeding Paragraphs as if fully set forth herein.

94.     Plaintiffs have provided health care services to Coventry Members in accordance with the terms of their Coventry provider agreements and have submitted clean claims for emergency room services rendered and otherwise performed as necessary to receive reimbursement under the terms of these agreements.

95.     Coventry is in breach of contract by paying Plaintiffs a $50 triage fee, in violation of the express language of the contracts, which require the MCO to pay a set percentage of Medicaid Rates for all outpatient services provided by Plaintiffs to Coventry Members.

96.     Plaintiffs are entitled to damages such as are proven at trial of this matter.

## COUNT III
**(Breach of Contract)**
*Defendant WellCare*

97.     Plaintiffs reallege and incorporate fully by reference all proceeding Paragraphs as if fully set forth herein.

98.     Plaintiffs have provided health care services to WellCare Members in accordance with the terms of their WellCare provider agreements and have submitted clean claims for emergency room services rendered and otherwise performed as necessary to receive reimbursement under the terms of these agreements.

99.     WellCare is in breach of contract by paying Plaintiffs a $50 triage fee in violation of the express language of the provider agreements which require that WellCare pay a set percentage of Medicaid Rates for outpatient services provided by Plaintiffs to WellCare's Members.

100.    Plaintiffs are entitled to damages such as are proven at the trial of this matter.

## COUNT IV
**(State Prompt Pay Violations)**

101.    Plaintiffs reallege and incorporate fully by reference all proceeding Paragraphs as if fully set forth herein.

102.    Prompt Pay requirements have also been included in the state regulations promulgated to implement the Waiver.

103.    Therefore, KRS 304.17A-700 to 304.17A-730 and KRS 205.593, KRS 304.14-135 and KRS 304.99-123 apply to Coventry and WellCare as MCOs under contract with the Cabinet to manage care, process healthcare claims and pay for services provided to Kentucky Medicaid recipients covered under the Waiver and enrolled in WellCare and Coventry's Medicaid managed care plans.

104.    These state Prompt Pay statutes are applicable to Coventry and WellCare by virtue of the fact that they are insurers authorized by the Kentucky Department of Insurance to do business in the Commonwealth of Kentucky.  *See* KRS §§304.17A-005 & 304.17A-700.

105.    Coventry and WellCare are required to pay interest on any amount of clean claim that is not timely paid as required by KRS 304.17A-700 to 304.17A-730 and KRS 205.593, 304.14-135, and 304.99-123. *See* KRS 304.17A-730.

106.    In failing to pay Plaintiffs anything more than $50 for what Coventry and WellCare have arbitrarily classified as "triage" claims, Coventry and WellCare are in violation applicable prompt pay requirements.

107.    Plaintiffs are entitled to interest at the applicable statutory rates for the difference between the $50 triage payments made and the payments that should have been made from the time each claim was submitted until such time as each claims has been paid in full.

108.    Plaintiffs are entitled to damages such as are proven at trial of this matter.

### COUNT V
**(42 U.S.C. § 1983 - Prompt Pay Violations)**

109.    Plaintiffs reallege and incorporate fully by reference all proceeding Paragraphs as if fully set forth herein.

110.    Plaintiffs are entitled to be paid promptly for providing medical services to Coventry's and WellCare's Members.  42 U.S.C. § 1396a(a)(37); 42 U.S.C. § 1396n(b)(4) and 42 U.S.C. § 1396u-2(f).

111.    While CMS can waive certain requirements of the Medicaid Act as part of a managed care waiver that permits the state to provide medical assistance through MCOs, these "**Prompt Pay Provisions**" imposed by federal statute and the state are not waivable by CMS or the state.  42 U.S.C. § 1396u-2(f).

112.    The state incorporated federal and state Prompt Pay provisions into its MCO Contracts with Coventry and WellCare.

113.    The federal Prompt Pay provisions clearly were intended to benefit the Plaintiffs; the right to prompt payment protected by these provisions is not so vague or amorphous as to strain judicial competence; and the requirements are mandatory.  *See*, *Appalachian Regional Healthcare v. Coventry Health and Life Insurance Co.*, 920 F.Supp. 2d 637, 698 – 700 (E.D. Ky. 2013).

114.    Coventry and WellCare agreed in their MCO contracts with the State to comply with all applicable federal and state laws and to assume the entire responsibility for making prompt payments to Plaintiffs.

115.    Plaintiffs have never agreed to be paid by Coventry and WellCare on any basis other than as provided by federal and state prompt pay statutes and regulations and their respective contracts.

116.    The action of Coventry and WellCare are part of a pattern and practice intended to deprive Plaintiffs of payment or to delay payment for services rendered by making Plaintiffs,

engage in costly and time-consuming appeals when there is no legal or factual basis for the MCOs to deny or delay Plaintiffs' claims for reimbursement.

117.    The actions of Coventry and WellCare were and are being done under color of state law and had and continue to have the effect of depriving Plaintiffs of rights secured by the Constitution and the Laws of the United States.

118.    Coventry and WellCare have deprived Plaintiffs of their property and their statutory rights by engaging in this scheme to make only $50 triage payments for ED services provided their Members.

119.    As a direct and proximate result of Coventry's and WellCare's actions, Plaintiffs have sustained injuries and damages in such amounts as to be determined at trial.

120.    Plaintiffs have retained the services of the attorneys in this action and if they prevail, are entitled to their reasonable attorney fees pursuant to 42 U.S.C. § 1988.

## COUNT VI
### (Unjust Enrichment)

121.    Plaintiffs reallege and incorporate fully by reference all proceeding Paragraphs as if fully set forth herein.

122.    Plaintiffs conferred benefits upon Coventry and WellCare by providing health care services to their Members which, in turn, discharged Coventry's and WellCare's contractual obligations to their Members.  In conferring these benefits, Plaintiffs acted under compulsion of law.

123.    While Coventry and WellCare have failed and refused to reimburse Plaintiffs fully for services provided their Members, Coventry and WellCare continued to accept monthly capitated payments from the Cabinet, amassing for themselves millions of dollars in profits.

124.     Coventry and WellCare have not adequately reimbursed Plaintiffs for outpatient services provided Coventry's and WellCare's members and are therefore being unjustly enriched at Plaintiffs' expense, Coventry and WellCare have inequitably retained appreciable benefits for which they have not fully paid, and are refusing to pay reasonable rates for those services.

125.     As a result Plaintiffs have been and will continue to suffer substantial damages in amounts to be proven at trial.

## COUNT VI
### (Quantum Meruit)

126.     Plaintiffs reallege and incorporate fully by reference all proceeding Paragraphs as if fully set forth herein.

127.     Plaintiffs in the alternative plead that they have rendered valuable services to Coventry and WellCare Members, which were received with Coventry's and WellCare's knowledge and consent.

128.     Plaintiffs rendered those services under such circumstances that Coventry and WellCare were reasonably notified that Plaintiffs were expecting to be paid by Coventry and WellCare for the reasonable value of their services.

129.     Coventry and WellCare nonetheless have refused and continue to refuse to reimburse Plaintiffs for the reasonable value of their services, which has and will continue to cause substantial damages to Plaintiffs in amounts to be proven at trial.

**WHEREFORE**, Plaintiffs request that this Court enter judgment against Defendants providing the following relief:

A.     A declaration that Defendants are required to comply with applicable federal, state and contractual Prompt Pay laws and provisions governing reimbursement for emergency room services rendered by Plaintiffs;

B.      A declaration that Defendants are in violation of the terms and conditions agreed upon in their respective Provider Agreements with Plaintiffs by paying Plaintiffs a nominal $50 triage fee for outpatient services;

C.      A declaration that Plaintiffs are entitled to prompt payment for all treatment and services they provide to Defendants Members in the form of emergency room services and that Plaintiffs are entitled to interest at the statutory rates until all such shortfalls between the contracted rates and the $50 triage payments are corrected;

D.      A declaration that the criteria used by Defendants to reimburse Plaintiffs for providing emergency room services conflicts with the Plaintiffs' EMTALA obligations;

E.      A declaration that the criteria used by Defendants to reimburse Plaintiffs for providing emergency room services violates 42 CFR 438.114(d)(1)(i)'s mandate that the standard for determining the need for emergency care is determined by medical personnel present in the emergency room using the prudent layperson standard;

F.      A declaration that the criteria used by Defendants to reimburse Plaintiffs for providing emergency room service violates the State Plan Amendment requiring emergency room medical personnel determine what evaluative, emergency and ancillary services are necessary;

G.      A declaration Defendants are required to pay the contract rate or the reasonable value of services rendered for non-emergent services based on the State Plan Amendment which expressly allows the patient to continue treatment in the emergency room;

H.      Compensatory damages in whatever amounts that Plaintiffs are found to be entitled;

I.      Permanent injunctive relief against Defendants;

J.      Trial by jury on all issues so triable; and

K.      Reasonable attorneys' fees and such other relief to which Plaintiffs may be

entitled.

Respectfully submitted,

*/s/ Stephen R. Price, Sr.*
Stephen R. Price, Sr.
sprice@wyattfirm.com
Carole D. Christian
cchristian@wyattfirm.com
Brittany L. Hampton
bhampton@wyattfirm.com
WYATT, TARRANT & COMBS, LLP
500 West Jefferson Street, Suite 2800
Louisville, Kentucky  40202-2898
502.589.5235

*Counsel for Plaintiffs*

61221451.1