UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CIVIL ACTION NO. 3:15-cv-00455-JHM

BOURBON COMMUNITY HOSPITAL,                                         PLAINTIFFS
LLC d/b/a BOURBON COMMUNITY
HOSPITAL, ET AL.

V.

COVENTRY HEALTH AND LIFE                                            DEFENDANTS
INSURANCE COMPANY, ET AL.

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendants' Motions to Dismiss [DN 35, 36] and Defendant Coventry's Motion to Seal Document [DN 57]. Fully briefed, this matter is ripe for decision. For the following reasons, both Motions to Dismiss are **GRANTED,** and Defendant Coventry's Motion to Seal is **DENIED as MOOT**.

**I. BACKGROUND**

In 2011, the Commonwealth of Kentucky shifted away from the traditional fee-for-service method of Medicaid reimbursement, and contracted instead with managed care organizations (hereinafter "MCOs") to provide a managed care system for Medicaid members throughout the Commonwealth. (Pls.' Compl. [DN 1] ¶ 30.) Under this managed care system, MCOs provide healthcare to Medicaid beneficiaries in exchange for capitation payments from the state. (Id. ¶¶ 30, 32.) MCOs enroll Medicaid beneficiaries as members, contract with healthcare providers to provide services to the members, and reimburse the providers for those services. (Id. ¶ 32.) Defendants in this case are two MCOs. Plaintiffs are a collection of various Kentucky hospitals, all of whom have contracted with Defendants to provide healthcare to members of Defendants' Medicaid managed care plans in Kentucky.

The contracts between the Defendants and Plaintiffs require both parties to abide by all federal and state laws, regulations, and standards. (Id. ¶ 36.) Under federal law, 42 U.S.C. § 1396u-2(b)(2)(A)(i), Defendant MCOs are required to provide coverage for members who present emergency conditions, determined under the prudent layperson standard, to an emergency department without regard to prior authorization or the emergency care provider's contractual relationship with the MCO. (Id. ¶ 37.) And Plaintiff hospitals are required to comply with the Emergency Medical Treatment Active Labor Act (hereinafter "EMTALA"), 42 U.S.C. § 1395dd, which requires hospitals to evaluate and stabilize all individuals who present emergency conditions, determined by the prudent layperson standard, regardless of their ability to pay or their health insurance coverage. (Id. ¶ 40.) Additionally, all agreements state that the MCOs are obligated to pay the hospitals in exchange for the hospitals providing healthcare to the MCOs' members. (Id. ¶¶ 67, 72.) These provider agreements include a schedule of rates at which Defendants must pay for rendered healthcare services. (Id. ¶¶ 67, 72.) These rates are based on the federal Center for Medicare and Medicaid Services rates, and, for emergency services, MCOs are required to pay 101 percent of the hospital's costs, 42 C.F.R. § 413.7(b)-(d). (Id. ¶ 63.) This federal mandate is reflected in each of the provider agreements.

After the managed care system was established in Kentucky, a third, non-named MCO, Kentucky Spirit Health Plan began experiencing financial difficulties and sent letters to its contracted healthcare providers stating that "beginning July 1, 2012, it would start making only a $50 'triage' payment for certain ED services," meaning

> Emergency Department (ED) claims coded with a diagnosis that represents a disease or condition that is recognized as an emergency will result in the claim being treated and reimbursed as an emergency service based on the rate negotiated with the hospital. Claims for emergency services submitted with a diagnosis that represents a disease or condition that is not recognized as an emergency situation will be paid at an ED triage rate of $50.00.

2

(Id. ¶ 79.) Subsequently, Defendants both followed suit, each sending Plaintiffs similar letters stating that Defendants would review emergency department claims and determine after the fact if the claim met the prudent layperson standard for an emergency condition, and all claims determined to not meet the standard would only be reimbursed with a $50.00 triage fee. (Id. ¶ 81–82.)

Considering this new reimbursement rate a breach of their contracts, Plaintiffs filed suit in this Court maintaining that they are entitled to receive the full contractual rate for all healthcare, including emergency, services rendered. Plaintiffs now seek a declaration that Defendants have breached the provider agreements in regard to the triage fee payments, that Defendants are required to pay the contractual rate for all healthcare services rather than the $50 triage fee, and that the triage fee violates state and federal laws. (Id. at 27–28.) Additionally, Plaintiffs seek compensatory damages for all claims paid with the triage fee and permanent injunctive relief for future payments. (Id.) In turn, Defendants move to dismiss all counts of the Plaintiffs' Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

## II. STANDARD OF REVIEW

Upon a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), a court "must construe the complaint in the light most favorable to plaintiffs," League of United Latin Am. Citizens v. Bredesen, 500 F.3d 523, 527 (6th Cir. 2007) (citation omitted), "accept all well-pled factual allegations as true," id., and determine whether the "complaint . . . states a plausible claim for relief," Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). Under this standard, the plaintiff must provide the grounds for its entitlement to relief, which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). A plaintiff satisfies this standard only when it "pleads

3

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. A complaint falls short if it pleads facts "merely consistent with a defendant's liability" or if the alleged facts do not "permit the court to infer more than the mere possibility of misconduct." Id. at 679. Instead, "a complaint must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" Id. at 663 (quoting Fed. R. Civ. P. 8(a)(2)). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

### III. DISCUSSION

Plaintiffs assert seven counts in their Complaint. Plaintiffs assert federal question jurisdiction pursuant to 28 U.S.C. § 1331 in two Counts: in Count V, seeking redress for the deprivation of their civil rights under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 based on federal prompt pay violations under 42 U.S.C. §§ 1396a(a)(37), 1396n(b)(4), 1396u-2(f), and, in Count I, seeking a declaration of their rights under their provider agreements pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201. The remaining claims are all state court claims, and Plaintiffs ask the Court to exercise supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367. The Court will first address the two claims giving rise to federal question jurisdiction before turning to Plaintiff's state law claims.

**A. Plaintiffs' § 1983 Claim for Federal Prompt Pay Violations (Count V)**

In a § 1983 action, the claim "must satisfy two elements: '1) the deprivation of a right secured by the Constitution or laws of the United States and 2) the deprivation was caused by a person acting under color of state law.'" Ellison v. Garbarino, 48 F.3d 192, 194 (6th Cir. 1995)

(quoting Simescu v. Emmet County Dept. of Social Servs., 942 F.2d 372, 374 (6th Cir. 1991) (citing Flagg Brothers, Inc. v. Brooks, 436 U.S. 149, 155 (1978))). Defendants argue that Plaintiffs' § 1983 claim fails both prongs of this test: first that the federal Prompt Pay laws do not create individually enforceable private rights to ensure timely payment under the Medicaid Act and, second, that Defendants did not act under the color of state law. After considering the arguments of the parties, the Court finds that Defendants were not acting under the color of state law and therefore Count V must be dismissed.

In order to determine whether or not a defendant acted under the color of state law, his or her conduct must infringe on a plaintiff's right secured by the Constitution or by the laws of the United States, and the conduct that gave rise to this deprivation must be "fairly attributable to the State." Marie v. Am. Red Cross, 771 F.3d 344, 362 (6th Cir. 2014). The Sixth Circuit "has recognized as many as four tests to aid courts in determining whether challenged conduct is fairly attributable to the State: (1) the public function test; (2) the state compulsion test; (3) the symbiotic relationship or nexus test; and (4) the entwinement test." Marie, 771 F.3d at 362 (citing Vistein v. Am. Registry of Radiologic Technologists, 342 Fed. Appx. 113, 127 (6th Cir. 2009)); see Wolotsky v. Huhn, 960 F.2d 1331, 1335 (6th Cir. 1992); see also Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n, 531 U.S. 288, 298 (2001))).

Under the first test, in order to prove that Defendants "were state actors under the public functions test, [Plaintiffs] must show that '[Defendants] exercise powers which are traditionally exclusively reserved to the state, such as holding elections or eminent domain.'" Marie, 771 F.3d at 362 (quoting Wilcher v. City of Akron, 498 F.3d 516, 519 (6th Cir. 2007)). Plaintiffs argue that because Defendants contracted with the State of Kentucky to provide medical assistance to Kentucky's Medicaid beneficiaries, which included establishing provider networks and making

5

provider payments, Defendants clearly had taken on the function of the state. Plaintiffs have the burden "to advance historical and factual allegations in their complaint giving rise a reasonable inference that [Defendants' responsibilities are] traditionally exclusively in the province of the State." Marie, 771 F.3d at 362 (citing Wittstock v. Mark A. Van Sile, Inc., 330 F.3d 899, 902 (6th Cir. 2003) ("When considering whether private action should be attributed to the state under the public function test, the court conducts a historical analysis to determine whether the party has engaged in an action traditionally reserved to the state, and the plaintiff bears the burden of making that showing.")). "Under this 'relatively stiff test,' few areas are deemed exclusive state action (e.g. elections, eminent domain), and many other actions–even those that involve extensive government regulation–do not suffice to establish state action (e.g. insurance, education, workers' compensation, or electrical utilities)." Id. at 362–63 (citations omitted). Plaintiff relies heavily on Tenn. Ass'n of Health Maint. Orgs., Inc. v. Grier, 262 F.3d 559, 565 (6th Cir. 2001) in stating that "the Sixth Circuit found it quite obvious the MCOs were state actors since in providing Medicaid managed care services they were acting on behalf of the state which, 'by statute, is the single state agency responsible for administration of the TennCare program.'" (Pls.' Resp. [DN 48] at 22.) Aside from the fact that Plaintiffs assert no historical facts or analysis to show that the management of Medicare funds is exclusively within the province of the state, Plaintiffs plainly misstate the law of this Circuit. In Goetz, the Middle District of Tennessee went to great lengths to clarify that the Grier court "did not address the constitutional question of whether a provider is a state actor, and did not hold that providers are state actors." Grier v. Goetz, 421 F. Supp. 2d 1080, 1083 (M.D. Tenn. 2006). Therefore, Plaintiffs' statement that this Circuit considers MCOs to be state actors because of the Grier decision is unfounded. In fact, many courts have considered whether MCOs are state actors and

6

have come to the opposite conclusion. Gonzalez–Maldonado v. MMM Healthcare, Inc., 693 F.3d 244, 248 (1st Cir. 2012) (holding that "the public function exception applies to 'traditionally exclusively' public functions" and "operating an HMO" does not "qualify," so MCOs "are not governmental actors"); Quinones v. UnitedHealth Grp. Inc., No. CIV. 14-00497 LEK, 2015 WL 4523499, at *4 (D. Haw. July 24, 2015) (finding the public function test simply did not apply to defendant MCOs and HMOs); see New Jersey Primary Care Ass'n Inc. v. New Jersey Dep't of Human Servs., 722 F.3d 527, 537 (3d Cir. 2013) (considering MCOs "non-state actors"); Karen L. ex rel. Jane L. v. Physicians Health Servs., Inc., 202 F.R.D. 94, 105 (D. Conn. 2001) (finding defendant MCO is not a state actor or government agency despite its contract with the Department of Social Services). Simply because a "private entity performs a function which serves the public does not make its acts state action." Children's Hosp. of Philadelphia v. Horizon NJ Health, No. CIV.A. 07-5061, 2008 WL 4330311, at *3 (E.D. Pa. Sept. 22, 2008). Additionally, even though MCOs operate "under a comprehensive matrix of federal laws regulations and constraints," the "functions performed by [MCOs] cannot be construed to be traditionally the exclusive prerogative of the state." Childrens' Hosp., 2008 WL 4330311, at *3. Therefore, Defendants cannot satisfy this test, as Plaintiffs have not met their burden to show that historically Defendants' conduct was within the sole province of the state government.

The second test for determining whether a party is a state actor is the state compulsion test. This "test requires that a state exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state." Wolotsky v. Huhn, 960 F.2d 1331, 1335 (6th Cir. 1992) (citing Blum v. Yaretsky, 457 U.S. 991, 1004 (1982); Bier v. Fleming, 717 F.2d 308, 311 (6th Cir.1983), cert. denied, 465 U.S. 1026 (1984)). Further, "[m]ore than mere approval or acquiescence in the

7

initiatives of the private party is necessary to hold the state responsible for those initiatives." Id. (citing Blum, 457 U.S. at 1004). Additionally, the grant of state funds to the party in question does not give rise to coercive power or state action under this test. Id. Plaintiffs do not assert any facts in their Complaint or arguments in their briefs to support a finding that the Commonwealth of Kentucky exercised any coercive power or encouragement over the operation of Defendants' business in order to convert Defendants into state actors. Therefore, the Court must find that Defendants do not satisfy this test.

Under the third test, the symbiotic relationship or nexus test, "the action of a private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself." Id. (citing Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351 (1974); Burton v. Wilmington Parking Auth., 365 U.S. 715, 724–25 (1961)). Simply "because a business is subject to state regulation does not by itself convert its action into state action." Id. (citing Jackson, 419 U.S. at 350). Instead, "it must be demonstrated that the state is intimately involved in the challenged private conduct in order for that conduct to be attributed to the state for purposes of section 1983." Id. (citing Bier, 717 F.2d at 311).

Plaintiffs claim that Kentucky delegated to Defendants its entire duty to provide Medicaid services and to promptly pay hospitals for those medical services in order to enable the Medicaid Managed Care Waiver to function; therefore, Defendants have entered into a symbiotic relationship with the Commonwealth of Kentucky and must be considered state actors. Plaintiffs heavily rely on the Burton decision, in which a private restaurant, located within an off-street automobile parking building, refused to serve African Americans customers. 365 U.S. at 716. The Wilmington Parking Authority, a state agency, owned the building and leased it to

the restaurant. Id. The Supreme Court found that the symbiotic relationship between the restaurant and the state was enough to elevate the private restaurant's actions to the level of stat activity. Id. at 724–26. Plaintiffs insist that this case is totally instructive, as they claim that Defendants and the Commonwealth of Kentucky have a "far closer and more involved" relationship. However, in Burton, many factors led the Court to its decision: "[t]he land and building were publicly owned"; "the building was dedicated to 'public uses' in performance of the Authority's 'essential governmental functions'"; "[t]he costs of land acquisition, construction, and maintenance are defrayed entirely from donations by the City of Wilmington, from loans and revenue bonds and from the proceeds of rentals and parking services out of which the loans and bonds were payable"; "[u]pkeep and maintenance of the building, including necessary repairs, were responsibilities of the Authority and were payable out of public funds"; and "profits earned by discrimination not only contribute to, but also are indispensable elements in, the financial success of a governmental agency." Id. at 723–24. Therefore, the Court found that "all these activities, obligations and responsibilities of the Authority, the benefits mutually conferred . . . indicate[d] [a] degree of state participation and involvement in discriminatory action which it was the design of the Fourteenth Amendment to condemn." Id. at 724. Additionally, the Third Circuit has explicitly limited Burton to cases involving lessees of public property. Children's Hospital, 2008 WL 4330311, at *3 (citing Chrissman v. Dover Downs Entm't, Inc., 289 F.3d 231, 240–41 (3d Cir. 2002)).

Despite this limitation, Plaintiffs here allege no similar facts that give rise to such a close nexus or symbiotic relationship aside from the fact that the Commonwealth of Kentucky has contracted with Defendants to provide payment to Medicare providers and provides the funding for those payments. Courts have consistently held that these facts alone are not enough to

9

support a finding of a symbiotic relationship. Rendell-Baker v. Kohn, 457 U.S. 830, 840 (1982) (concluding that the school's receipt of public funds does not render the school's discharge decisions acts of the State); Blum, 457 U.S. at 1011 (finding that funding of the private activity is not persuasive enough to hold the State responsible for decisions made by the private party in the course of its business); Marie, 771 F.3d at 363 ("[T]he fact that the [defendant] receives public funding is not sufficient to establish a close nexus between state and private actors."); Gonzalez-Maldonado, 693 F.3d at 248 (finding that government funding and regulation, alone, does not convert a private entity into a state actor, even when that actor manages state funds); Robert S. v. Stetson Sch., Inc., 256 F.3d 159, 165 (3d Cir. 2001) ("[I]t is clear that [the defendant's] receipt of government funds did not make it a state actor."). Government funding alone cannot "convert[] a private entity into an arm of the state—absent proof that the government 'has exercised coercive power or has provided . . . significant encouragement' for the challenged action." Gonzalez-Maldonado, 693 F.3d at 248 (quoting Blum, 457 U.S. at 1004) (citing Rendell–Baker, 457 U.S. at 840). Additionally, extensive regulation of a private entity also does "not suffice to establish state action." Marie, 771 F.3d at 362–63; see Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 52 (1999); Rendell–Baker, 457 U.S. at 842; Blum, 457 U.S., at 1004; Gonzalez-Maldonado, 693 F.3d at 248. State "regulations stop short of giving the state any interest or role in the day to day operations of [Defendants] or [their] decision-making as to how [they] run[] [their] business[es]." Crissman, 289 F.3d at 236. "If contracting, funding, and regulating was sufficient to create state action, nearly every government contract would produce the possibility of § 1983 liability against the government contractor. Congress did not intend this result, and such a decision . . . would conflict with clear Supreme Court precedent on this point." Quinones, 2015 WL 4523499, at *5.

Here, Plaintiffs allege that Defendants have entered into a symbiotic relationship with the Commonwealth because Defendants pay healthcare providers with federal funds in compliance with federal and state laws and regulations. Although Kentucky allows Defendants to control these federal funds and distribute them, Plaintiffs have not alleged any facts that demonstrate a symbiotic relationship or close nexus to the point where Defendants should be considered state actors. Plaintiffs have provided no facts to show that "the State 'has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'" Am. Mfrs. Mut. Ins. Co., 526 U.S. at 52. Therefore, because "merely contracting with the government, receiving government funding, and following government regulation—even if extensive and detailed—is not sufficient to establish state action," Plaintiffs have failed to allege sufficient facts establishing control by the State over the specific conduct of which Plaintiffs complain. Dicrescenzo v. UnitedHealth Grp. Inc., No. CV 15-00021 DKW-RLP, 2015 WL 5472926, at *6 (D. Haw. Sept. 16, 2015) (recognizing defendant's statement that "courts have unanimously held that a private health plan's status as a Managed Care Organization does not convert it into a state actor"). Id. at *5.

Lastly, under the entwinement test, Plaintiffs must show that Defendants are "'entwined with governmental policies' or that the government is 'entwined in [the private entity's] management or control.'" Marie, 771 F.3d at 363. "The crucial inquiry under the entwinement test is whether the 'nominally private character' of the private entity 'is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings [such that] there is no substantial reason to claim unfairness in applying constitutional standards to it.'" Vistein v. Am. Registry of Radiologic Technologists, 342 F. App'x 113, 128 (6th Cir. 2009) (quoting Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n, 531 U.S. 288, 298

11

(2001)). Plaintiffs cite Dillenberg, which does not actually address the entwinement test. J.K. By & Through R.K. v. Dillenberg, 836 F. Supp. 694, 698 (D. Ariz. 1993). Regardless, the court found that the regional behavioral health authority defendants (hereinafter "REBHAs") acted on behalf of the government and that their decisions constituted state action. Id. at 699. However, the State here was extensively involved in the defendant REBHAs' operations because the State of Arizona could issue orders that the REBHAs could not ignore and ordered one REHBA "to follow acceptable procedures during the pendency of this lawsuit, illustrating that they not only ha[d] the authority to exercise such control, they ha[d] actually exercised it."[1] Id. No such facts have been pled here. Plaintiffs have failed to show that the Commonwealth of Kentucky has any control over Defendants whatsoever. In fact, Plaintiffs state that the Commonwealth has entrusted Defendants with the responsibility of paying healthcare providers, which makes it seem as though the State in fact has no control over Defendants' internal workings or management. Plaintiffs have asserted that the Commonwealth has contracted with and provided funds to Defendants so that they may pay healthcare providers for their services, but, without more, Plaintiffs have not plead sufficient entwinement. In fact, many courts do not even consider the entwinement test relevant for determining if MCOs are state actors. Dicrescenzo, 2015 WL 5472926, at *6; Quinones, 2015 WL 4523499, at *6 n. 5; see Gonzalez, 693 F.3d at 248. Accordingly, Plaintiffs fail to allege sufficient facts in order to survive this test.

Because Defendants cannot be deemed state actors under any of the above four tests, Plaintiffs' § 1983 action cannot stand, and, therefore, the Court must dismiss Count V of the Complaint for failure to state a claim.

---

[1] Plaintiffs additionally rely on Perry v. Chen, 985 F. Supp. 1197, 1201–02 (D. Ariz. 1996). The defendants in Perry were also subject to extensive state involvement and oversight. The state agency that regulated the defendant health plans "issue[d] directives which the plans must follow and" created "rules, contracts and policies [for] the framework the plans . . . operate[d] within." Id. at 1202. Here, Plaintiff presents no facts to suggest that the Commonwealth controls Defendants' operations or decisions in any way.

**B. Plaintiffs' Declaratory Judgment Action**

Under the Declaratory Judgment Act, 28 U.S.C. § 2201, the exercise of jurisdiction is not mandatory. Bituminous Cas. Corp. v. J & L Lumber Co., 373 F.3d 807, 812 (6th Cir. 2004) (citing Brillhart v. Excess Ins. Co. of America, 316 U.S. 491, 494 (1942)). "[T]he Declaratory Judgment Act cannot be used to give relief indirectly which cannot be given directly. The statute is procedural and does not supply an independent ground of jurisdiction." First Fed. Sav. & Loan Ass'n of Bowling Green, Ky. v. McReynolds, 297 F. Supp. 1159, 1160 (W.D. Ky. 1969) (citing Skelly Oil Co. v. Phillips Co., 339 U.S. 667, 671; Rolls-Royce Limited v. United States, 364 F.2d 415, 419 (Ct. Cl. 1966); Mayer v. Ordman, 391 F.2d 889, 892 (6th Cir. 1968)). For the purposes of declaratory judgment actions brought in federal district court on the basis of federal question jurisdiction, the "court must determine whether or not the cause of action anticipated by the declaratory judgment plaintiff arises under federal law." Kentucky Fair Plan, 1999 WL 33603121, at *1 (citations omitted). And, as always, the Court must dismiss a case whenever it appears that it lacks subject matter jurisdiction. Kentucky Fair Plan v. Kobe, No. CIV.A. 1:99-CV-5-R, 1999 WL 33603121, at *1 (W.D. Ky. Aug. 25, 1999) (citing Fed. R. Civ. P. 12(h)(3)).

Here, Plaintiffs seek a declaration of Defendants' responsibilities to pay under their respective provider agreements and allege breach of federal Prompt Pay laws arising under § 1983, state prompt pay laws, breach of contract, unjust enrichment, and quantum meruit. As previously determined, Plaintiffs have not stated a valid claim for a § 1983 action, therefore, it cannot serve as an independent basis of jurisdiction for the declaratory judgment action. Plaintiffs additionally rely on EMTALA to provide an independent source of jurisdiction. Although EMTALA is federal law, it does not provide a jurisdictional basis for these claims and therefore cannot support the declaratory judgment action.

First, the "intent of [EMTALA] is to ensure that a physician does not shirk screening an indigent person or transfer that person to another hospital to avoid treating him because he cannot pay." Martin v. Ohio Cty. Hosp. Corp., 295 S.W.3d 104, 112 (Ky. 2009) (citing Nolen v. Boca Raton Cmty. Hosp., Inc., 373 F.3d 1151 (11th Cir. 2004)). Additionally, many courts have held that any private right of action that EMTALA affords is one "directly against hospitals for violation of the duties created by the statute." Id. (citing 42 U.S.C. § 1395dd(d)(2)); see Moses v. Providence Hosp. & Med. Centers, Inc., 561 F.3d 573, 581 (6th Cir. 2009) (finding that EMTALA "created private rights of action against hospitals"). In fact, the statute's legislative history shows that the civil enforcement provision permits suits against hospitals by patients that have suffered direct harm from the hospital's violations. Moses, 561 F.3d at 581. The House Judiciary Committee Report on the statute even states "that the only individual who can sue is the 'individual patient who suffers harm as a direct result of hospital's failure to appropriately screen, stabilize, or properly transfer that patient.'" Id. (quoting H.R. Rep. No. 99-241, pt. 3 at 6, reprinted in 1986 U.S.C.C.A.N. 726, 728). Though the Sixth Circuit has allowed a non-patient representative of a deceased patient to bring suit for violating EMTALA, the court recognized that "Congress intended to prevent hospitals from dumping patients who suffered from an emergency medical condition because they lacked insurance to pay the medical bills." Id. (quoting Thornton v. Sw. Detroit Hosp., 895 F.2d 1131, 1134 (6th Cir. 1990)). Therefore, it appears that EMTALA does not apply to MCOs since the Defendants are not hospitals and because Plaintiffs were not directly injured from any violation of EMTALA. See Colon-Ramos v. Clinica Santa Rosa, Inc., 938 F. Supp. 2d 222, 226 (D.P.R. 2013) (finding no authority that EMTALA applies to insurance companies and MCOs, and concluding that based on the legislative intent and plain wording of EMTALA, no cause of action against MCOs can stand).

Plaintiffs merely allege that their contracts with Defendants require them to abide by all federal and state laws, including EMTALA. Simply because Plaintiffs are required to abide by EMTALA does not mean that this suit "arises" under federal law. Against Defendant Wellcare, Plaintiffs neither discuss the jurisdictional basis for federal question jurisdiction nor do they advance arguments to support federal question jurisdiction on the basis of EMTALA. Against Defendant Coventry, Plaintiffs simply skirt the issue by stating that they can bring a declaratory action to define the parties' respective roles under the provider agreements. However, with the dismissal of the § 1983 action, the Court has "a duty to consider their subject matter jurisdiction in regard to every case and may raise the issue sua sponte." Bowman, 2015 WL 4018426, at *1 (citing Answers in Genesis, 556 F.3d at 465). Here, EMTALA is only relevant in the sense that it requires hospitals to provide stabilizing treatment or appropriate transfer of an individual once that patient has been deemed to have an emergency medical condition under the prudent layperson standard. 42 U.S.C. 1395dd(b)(1); 42 CFR § 438.114(a). The action at hand deals with the payment of claims that Defendants, after patients have been screened and treated as having an emergency condition under the prudent layperson standard, determine actually dealt with non-emergent conditions. This payment structure in no way requires the interpretation of Defendant MCOs' responsibilities under EMTALA because it does not apply to them. Additionally, this action in no way requires an interpretation of Plaintiff hospitals' responsibilities under EMTALA because, regardless of the fee structure, Plaintiffs allege they are still fully performing their duties under the statute.

In the absence of the § 1983 claim, Plaintiffs have not alleged a sufficient alternative jurisdictional basis for federal question jurisdiction in order to properly support their declaratory judgment action. Accordingly, Count I of the Complaint must be dismissed.

15

## C. State Law Claims

Because Plaintiffs' § 1983 and declaratory judgment claims have been dismissed, the only claims left are Plaintiff's state law claims for breach of contract, breach of Kentucky's prompt pay laws, unjust enrichment, and quantum meruit. Diversity jurisdiction does not exist here under 28 U.S.C. § 1332, as Plaintiffs have neither asserted such nor do the facts allow such a conclusion. The Sixth Circuit instructs that "generally, 'if the federal claims are dismissed before trial . . . the state claims should be dismissed as well.'" Powell v. James Marine, Inc., No. 5:13-CV-00154, 2013 WL 5937005, at *2 (W.D. Ky. Nov. 4, 2013) (quoting Landefeld v. Marion Gen. Hosp., Inc., 994 F.2d 1178, 1182 (6th Cir. 1993)). Section 1367(c) of Title 28 of the United States Code provides, in pertinent part, as follows: "The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." In Carnegie–Mellon University v. Cohill, 484 U.S. 343 (1988), the Supreme Court discussed the propriety of exercising supplemental jurisdiction over pendent state-law claims following its decision in United Mine Workers v. Gibbs, 383 U.S. 715 (1966).

> The Gibbs Court recognized that a federal court's determination of state-law claims could conflict with the principle of comity to the States and with the promotion of justice between the litigating parties. For this reason, Gibbs emphasized that "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." Under Gibbs, a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims. When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.

Carnegie–Mellon, 484 U.S. at 349–50.

Because Plaintiffs' federal causes of action have all been dismissed, the Court will decline to exercise supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367(c)(3).  See Powell, 2013 WL 5937005, at *3.  In fact, "[t]o do otherwise would cause this Court to needlessly decide Kentucky state law issues that are best reserved for Kentucky courts."  Id.  Accordingly, all of Plaintiffs' state law claims including breach of contract, state law prompt pay violations, unjust enrichment, and quantum meruit are dismissed without prejudice.

## IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendants' Motions to Dismiss are **GRANTED**.  Additionally, Defendant Coventry's Motion to Seal Document is **DENIED as MOOT**.

*[signature]*

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

December 28, 2015

cc: counsel of record